**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| FOURTH INVESTMENT LP, a California limited partnership, *Plaintiff-Appellant*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *Defendant-Appellee*. | No. 11-56997 <br><br> D.C. No. 3:08-cv-00110-BTM-BLM |

| | |
|---|---|
| LEEDS, LP, a California limited partnership, *Plaintiff-Appellant*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *Defendant-Appellee*. | No. 11-57009 <br><br> D.C. No. 3:08-cv-00100-BTM-BLM <br><br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
April 12, 2013—Pasadena, California

Filed June 13, 2013

Before: Milan D. Smith, Jr. and Mary H. Murguia, Circuit Judges, and Jack Zouhary, District Judge.[*]

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[**]

### Tax

The panel affirmed the district court's decision denying appellants' quiet title claims to remove federal tax liens encumbering their real properties and upholding the validity of tax liens filed by the Internal Revenue Service.

The tax liens arose from assessments against taxpayers Susanne and Don Ballantyne, based on the IRS's claim that appellants held the properties as nominees of taxpayers as the result of a series of complex transactions involving shell entities created and controlled by taxpayers. The panel held that California law unambiguously recognizes the existence of nominee ownership. Moreover, although state courts have not precisely specified the factors relevant to the analysis, the panel predicted that the California Supreme Court would evaluate nominee status in light of the criteria set forth in relevant federal cases. The panel explained that courts should look initially to state law to determine what rights the

[*] The Honorable Jack Zouhary, District Judge for the U.S. District Court for the Northern District of Ohio, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

taxpayer has in the property the Government seeks to reach and, after determining that the taxpayer has a property interest under state law, the courts should look to federal law to determine whether the taxpayer's rights qualify as property or a property right within the compass of the federal tax lien legislation. The panel then considered a six-factor test under federal law to determine nominee ownership and held that, in this case, the district court properly determined that appellants were taxpayers' nominees.

## COUNSEL

Wendy C. Lascher (argued), Ferguson Case Orr Paterson LLP, Ventura, California, for Plaintiffs-Appellants.

Thomas J. Clark (argued), Supervising Attorney, and Bethany B. Hauser, United States Department of Justice, Tax Division, Washington, D.C., for Defendant-Appellee.

## OPINION

M. SMITH, Circuit Judge:

Plaintiffs-Appellants Leeds, LP (Leeds) and Fourth Investment, LP (Fourth Investment) (sometimes collectively, Appellants) brought quiet title actions challenging tax liens filed by the Internal Revenue Service (IRS) against certain commercial and residential properties located in San Diego, California, to which Appellants hold legal title. The tax liens arose from assessments against taxpayers Susanne and Don Ballantyne, based on the IRS's claim that Appellants held the relevant properties as nominees of the Ballantynes on the

assessment dates. After a thirteen-day bench trial, the district court denied Appellants' quiet title claims and upheld the validity of the tax liens.

Appellants appeal, contending that California does not recognize nominee ownership. We reject this argument because California cases have unambiguously recognized the existence of nominee ownership. Although California courts have not precisely specified the factors relevant to performing a nominee analysis, we predict that the California Supreme Court would evaluate nominee status in light of the criteria set forth in relevant federal cases. Applying those criteria, the district court properly concluded that Appellants held legal title to the San Diego properties as nominees of the Ballantynes. We also reject Appellants' assertion that the district court's judgment should be vacated for failure to join the numerous shell entities utilized by the Ballantynes as part of their complex tax evasion scheme. We affirm the decision of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.  The Ballantynes' federal tax liabilities

Susanne (Susanne) and Don (Don) Ballantyne owe the IRS substantial federal income taxes for tax years 1985, 1986, 1990, and 1997. In July 1994, the Ballantynes sought relief before the United States Tax Court, challenging income tax deficiencies claimed by the IRS for tax years 1985 and 1986, in the amounts of $388,937 and $931,970, respectively (totaling $1,320,907, collectively). The tax court conducted a trial in May 1995, and in October 1996, confirmed the deficiencies claimed by the IRS. The decision of the tax court was later affirmed on appeal by our court, *see*

*Ballantyne v. Comm'r*, 211 F.3d 1272 (9th Cir. 1999), and in June 1997, the IRS imposed an assessment of $1,320,907.

The Ballantynes' tax issues were not limited to those tried in the tax court. In January 1995, the IRS imposed an assessment of $25,164 for alleged income tax deficiencies for tax year 1990. In October 1998, the IRS imposed an assessment of $11,515 based on alleged deficiencies for tax year 1987. As a result of the referenced assessments, plus applicable interest and penalties, the IRS recorded liens in the amount of $5,212,494.62 on two properties in San Diego, California: a home located at 3207 McCall Street (the McCall property), and a commercial building located at 1280 Fourth Avenue (the Fourth property). On the dates of the second and third assessments, fee title to the McCall property was vested in Leeds, and fee title to the Fourth property was vested in Fourth Investment. The referenced tax lien identified Leeds and Fourth Investment as nominees of the Ballantynes.

## 2. Transfer of the McCall and Fourth properties to Leeds and Fourth Investment

With the specter of their tax trial looming in 1995, Susanne caused the Ballantyne Trust to transfer legal title to the McCall and Fourth properties to Leeds and Fourth Investment, and later to her and Don's children's trusts, through a series of complex transactions involving shell entities created and controlled by the Ballantynes.

### A. The McCall Property

The McCall property is a single family residence, built by Susanne's parents. At some point in time, fee title to the McCall property was vested in a trust created by Susanne's

mother, styled the Susan T. Cramer Trust (the Cramer Trust). In 1979, after the death of Susanne's mother, and after Susanne's brother, Ed, had received the distributions from the Cramer Trust to which he was entitled, Susanne became the Cramer Trust's sole beneficiary and trustee. In 1987, Susanne created the Susanne C. Ballantyne Trust (the Ballantyne Trust), a revocable intervivos trust, into which she placed substantially all of her assets, including the corpus of the Cramer Trust (which included the McCall property).

In June 1995, shortly after the Ballantynes' tax court trial, the Cramer Trust conveyed the McCall property to Leeds, a newly created limited partnership, in exchange for a 99% limited partnership interest in Leeds. (The title transfer documents in this transaction were not recorded until July 1997, more than two years after the transfer.) The Cramer Trust immediately transferred its 99% interest in Leeds to the Ballantyne Trust, with Susanne executing all relevant documents on behalf of both trusts. The remaining 1% interest in Leeds was owned by a newly created entity, styled the Rhodes Investment Corporation, which was wholly owned by the Ballantyne Trust. After these transactions concluded, Susanne became the indirect owner of both the buyer and the seller of the McCall property. Specifically, after the transfers, the Ballantyne Trust owned a 99% limited partnership interest in Leeds; and Rhodes, which was owned by the Ballantyne Trust, owned a 1% general partnership interest in Leeds. No evidence was introduced at trial indicating that Leeds was created for any purpose other than to hold nominal title to the McCall property.

After the transfer to Leeds, the Ballantynes continued to maintain possession of the McCall property, purportedly as tenants of Leeds. A lease agreement was signed by Susanne

on behalf of Leeds, and by Don on behalf of the Ballantynes. The Ballantynes did not begin paying rent to Leeds until nearly a year after the lease was signed. When rent was paid, it was almost never paid on time, and was rarely paid in full. In fact, it appears that the "rent" Leeds received was not rent at all, but rather payments made by the Ballantynes to cover various property expenses as they arose. Despite the Ballantynes' failure to pay rent on a timely basis or in the correct amount, Leeds never demanded full payment or charged the $100 late fee required in the lease agreement.

## B. The Fourth property

The Fourth property is a commercial property in which Susanne originally owned a 12.5% undivided interest, and from which she derived rental income under a triple net lease. In 1988, Susanne quitclaimed her undivided 12.5% interest in the Fourth property to the Ballantyne Trust. In June 1995, shortly after the Ballantynes' tax court trial, the Ballantyne Trust conveyed the Fourth property to Fourth Investment, a newly created limited partnership, in exchange for a 99% limited partnership interest in Fourth Investment. (The grant deed was not recorded until October 1995, more than three months later.) The remaining 1% interest in Fourth Investment was owned by its general partner, Rhodes, which in turn was owned by the Ballantyne Trust.

Susanne indirectly owned and controlled both the buyer and the seller in the Fourth property transfer. Specifically, Fourth Investment's 99% limited partner was the Ballantyne Trust, and its 1% general partner was Rhodes (owned by the Ballantyne Trust). No evidence was introduced at trial showing that Fourth Investment ever served any function other than nominally holding title to the Fourth property.

Susanne retained control over the Fourth property's income stream after the transfer of her interest to Fourth Investment because, pursuant to Susanne's instructions, the rental income derived from the Fourth property continued to be paid to Susanne's brother, Ed, to whom Susanne owed a debt. Tenant rent payments were not made to Fourth Investment until Susanne notified her tenant to do so months after the Ballantyne Trust conveyed the Fourth property to Fourth Investment. The record does not reflect whether the tenant of the Fourth property was ever advised that the property's ownership (and, therefore, the tenant's landlord) had changed.

## 3.  Encumbrances on the McCall and Fourth properties

Four days before the commencement of their tax court trial, the Ballantynes entered into another dizzying series of transactions which made their assets (including the McCall and Fourth properties) appear to be encumbered and nearly worthless. Specifically, in May 1995, Susanne caused the Ballantyne Trust to file a UCC-1 Financing Statement purporting to show that the Ballantyne Trust and its non real estate assets were encumbered by a personal property lien as security for a $1.1 million debt that had allegedly been incurred in November 1991, more than three years earlier. The $1.1 million debt was owed to an entity named Eastman Investment, which in turn had procured loans totaling $1.1 million from two banks. Eastman Investment was yet another family-created entity, owned 20% by the Ballantyne Trust and 80% by another company, Cramer Investments. Cramer Investments, in turn, was owned in equal parts by Susanne and her brother, Ed.

In June 1995, shortly after the conclusion of their tax court trial, Susanne caused the Ballantyne Trust to record deeds of trust that purported to specifically encumber the McCall and Fourth properties as further security for the Eastman Investment debt.  Although the McCall and Fourth properties appeared to have been encumbered in connection with the Eastman Investment transaction, the Ballantynes' own valuation of Leeds and Fourth Investment (which then held title to the McCall and Fourth properties) did not show that Leeds, Fourth Investment, or the real properties they owned, were encumbered by the liens of the referenced deeds of trust.

Subsequently, in July 1995, the Ballantyne Trust granted Eastman Investment a first security interest in Rhodes (the general partner of Leeds and Fourth Investment), and TPH Investments, LP (TPH), another newly formed limited partnership, which was also owned and controlled by the Ballantyne Trust. Susanne executed this transaction on behalf of both Eastman Investment and the Ballantyne Trust, but the Ballantyne Trust received no consideration for its granting of these additional security interests.

## 4.  Transfer of the McCall and Fourth properties to the Children's Trusts

The Ballantynes next created a plethora of new entities for the purpose of transferring the McCall and Fourth properties to their children without realizing any taxable gain.[1]  The principal vehicle used to effectuate these transfers

---

[1] The Byzantine series of entities created by the Ballantynes, and the extraordinarily complex scheme in which they operated, brings to mind Sir Walter Scott's observation: "Oh, what a tangled web we weave, When

was a limited partnership styled Hemet C, which acquired the Ballantyne Trust's 99% limited partnership interest in Leeds and Fourth Investment in a series of transactions that occurred between January 1996 and February 1997. Hemet C was structured such that a group of trusts owned by the Ballantynes' children (the Children's Trusts) owned a 99% limited partnership interest, and a company styled Snow Valley Holdings, Inc., whose shares were owned by the Children's Trusts, was its 1% general partner. The Ballantynes and their children served as Snow Valley's officers and directors. The Ballantyne Trust exchanged its limited partnership interest in Leeds (valued by the Ballantynes at $323,070) for a $248,000 promissory note and an agreement by Hemet C to assume a $75,000 unsecured debt that Don owed to a relative. Susanne signed on behalf of the Ballantyne Trust, and Don signed on behalf of Hemet C. Don testified that the Ballantyne Trust had previously assumed his familial debt, but he conceded that the assumption of debt was undocumented and not supported by consideration.

The Leeds promissory note was immediately assigned to TPH. Shortly thereafter, the Ballantyne Trust deducted $176,638.32 from the $248,000 principal on the Leeds note (a nearly 80 percent reduction) to credit Hemet C for accrued interest on various notes held by the Children's Trusts. The notes, which were all in default, had purportedly been made several years earlier by companies owned by the Ballantynes that had subsequently gone out of business. Don testified that the defaulted notes had been guaranteed by the Ballantyne Trust when made, but there is no record of any guarantee, and

first we practice to deceive!" Sir Walter Scott, *Marmion*, Canto vi, Stanza 17 (1808).

at least four of the purported loans were made before the Ballantyne Trust even purchased the companies.

The Ballantyne Trust exchanged its limited partnership interest in Fourth Investment (valued by the Ballantynes at $317,000) for a $251,000 promissory note and an agreement by Hemet C to assume $66,000 in unsecured promissory notes owed to various Ballantyne-owned companies and the Children's Trusts.  Nearly two-thirds of the $66,000 in assumed notes arose from circular transfers of funds between the Ballantyne Trust and the Children's Trusts.  Specifically, the Ballantyne Trust transferred $40,000 to the Children's Trusts in December 1993, and borrowed $40,000 from the Children's Trusts contemporaneously.

Like the Leeds note, the Fourth Investment note was immediately assigned to TPH, and was thereafter reduced by $66,000 due to an alleged accounting error by Susanne.  The note was subsequently reduced by another $21,675.76 to give Hemet C credit for accrued interest on the assumed debts, despite the fact that Hemet C had made no interest payments. The reduction of the promissory note was not supported by consideration.

Hemet C apparently made some payments on the unsecured promissory notes, but, at most, only $500 was distributed on the Leeds note and $11,000 on the Fourth Investment note, before Hemet C re-acquired its own notes from TPH in the transaction described below.

## 5.  Foreclosure

In October 1997, the Ballantynes figuratively, but intentionally, toppled the house of cards they had created by

causing a foreclosure on secured debt involving several entities within their control, for the purpose of transferring the McCall and Fourth properties to their children without consideration.  To effectuate the foreclosure, the Ballantyne Trust ceased making payments on the $1.1 million Eastman Investment debt, and Eastman Investment (which was effectively controlled by Susanne[2]) made no effort to collect. The Ballantyne Trust then gave partnership interests in Investment Associates, LP, a limited partnership owned by the Children's Trusts and controlled by Don, to a newly created entity, Fulton 162, also owned by the Children's Trusts and controlled by Don.  In exchange, Fulton 162 agreed to make payments on the Eastman Investment note. But Fulton 162 made no payments.  In a purported attempt to protect itself from an impending default, Eastman Investment then sold the Eastman Investment note to New Horizon Lighting, LC (yet another Ballantyne-created entity owned by other Ballantyne-created entities and controlled by the Children's Trusts).  In exchange for the note, Eastman Investment received an identical note, thereby rendering the transfer wholly without substance.

New Horizon subsequently foreclosed on its security interests to satisfy the Eastman Investment note.  As a result, Hemet C (controlled by the Children's Trusts) acquired the Ballantyne Trust's interests in TPH, including the limited

---

[2] Although Susanne's brother Ed owned a 50% interest in a company that in turn owned an 80% interest in Eastman Investment, Susanne appears to have had effective control over Eastman Investment at all times. Specifically, she executed virtually every document involved in the Eastman Investment loan, and there is no indication that Ed ever sought to protect his interest in Eastman Investment despite the complete failure of Ballantyne-owned entities to make any payments on the Eastman Investment note.

partnership interests in Leeds and Fourth. The Children's Trusts also acquired the Ballantyne Trust's interest in Rhodes, the general partner of Leeds and Fourth. The foreclosure had no effect on the Ballantynes as a practical matter, however, because New Horizon chose not to foreclose on the McCall and Fourth properties, or to take any of the Ballantynes' personal property that it had acquired as a result of the foreclosure.

## 6.  Present action

In January 2008, Appellants filed these now-consolidated quiet title actions seeking to remove the federal tax liens encumbering the McCall and Fourth properties. The district court concluded that Appellants held bare legal title to the properties as nominees of the Ballantynes. The district court looked to federal case law to supply the standards for evaluating the nominee doctrine under California law. The court's determination was based on findings that: (1) the initial transfer of the properties to Appellants in exchange for partnership units was undertaken as part of a larger scheme to transfer the properties to the Children's Trusts without adequate consideration; (2) the Ballantynes failed to show that the multiple transfers between and amongst the shell entities were effectuated for any purpose other than to evade substantial tax liabilities; (3) the Ballantynes continued to maintain possession and control over the McCall property throughout the relevant time period, and retained the power to direct the distribution of income from the Fourth property; and (4) few, if any, of the transactions discussed at trial were conducted at arms length. Appellants timely appealed the judgment. We have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review de novo the district court's interpretation of state law. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991). We review the district court's findings of fact for clear error, and its conclusions of law de novo. *Red Lion Hotels Franchising, Inc. v. MAK, LLC*, 663 F.3d 1080, 1087 (9th Cir. 2011).

## DISCUSSION

The IRS has broad powers to impose federal tax liens under 26 U.S.C. § 6321. Section 6321 provides that a lien may be imposed "upon all property and rights to property . . . belonging to" a taxpayer who has failed to pay taxes owed after assessment and demand. The Supreme Court has interpreted section 6321 to apply to all property of a taxpayer, including property that is held by a third party as the taxpayer's nominee or alter ego. *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51 (1977).

"A nominee is one who holds bare legal title to property for the benefit of another."[3]   *Scoville v. United States*,

---

[3] As aptly described by one scholar,

> Typical nominee . . . scenarios start with people falling behind on their taxes. Facing the loss of their homes or businesses to the federal government some taxpayers take steps to try to separate themselves from their valuable assets. The taxpayer's house may be deeded to a friend, although the taxpayer continues to reside there. Or perhaps all the taxpayer's cash disappears, yet the taxpayer's personal bills are being paid by a closely-held and controlled corporation. The factual

250 F.3d 1198, 1202 (8th Cir. 2001) (citations omitted). Although the Supreme Court has clearly indicated that the IRS may impose nominee tax liens, *see G.M. Leasing Corp.*, 429 U.S. at 350–51, it has provided only limited guidance concerning how such nominee determinations are to be made. However, the Court has explained that application of the federal tax lien statutes involves questions of both state and federal law. *See Drye v. United States*, 528 U.S. 49, 58 (1999); *see also United States v. Craft*, 535 U.S. 274, 278 (2002). "The federal tax lien statute itself 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.'" *Craft*, 535 U.S. at 278 (quoting *United States v. Bess*, 357 U.S. 51, 55 (1958)). Consequently, in making nominee determinations in a tax lien context, we must "look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach[.]" *Drye*, 528 U.S. at 58; *see also United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985) (noting that "state law controls in determining the nature of the legal interest which the taxpayer had in the property" (citations and internal quotations omitted)). After determining that the taxpayer has a property interest under state law, we "then [look] to federal law to determine whether

---

scenarios are as creative and varied as are taxpayers themselves. However, the tax collector's reaction is usually consistent: upon discovering that a third party is being used to thwart the IRS's collection efforts, the government will file a notice of a federal tax lien identifying the third-party target as the taxpayer's nominee or alter ego and will attempt to satisfy the tax liability from assets held by the third party.

Teresa Dondlinger Trissel, *A Uniform Standard for Alter Ego and Nominee Tax Litigation*, 58 Fed. Law. 38, 38 (2011).

the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *Drye*, 528 U.S. at 58.

The Government contends that nominee doctrine should be governed by federal common law rather than state law. We reject this position, just as it has been uniformly rejected by our sister circuits and by nearly every federal court that has examined the issue.[4,5]

The government correctly notes that under *Drye*, "the Code and interpretive case law place under federal, not state, control the ultimate issue whether a taxpayer has a beneficial

---

[4] *See Berkshire Bank v. Town of Ludlow*, 708 F.3d 249, 252 (1st Cir. 2013) (clarifying that state law, rather than federal law, provides the "substantive rules" of nominee doctrine) (quoting *Dalton v. Comm'r of Internal Revenue*, 682 F.3d 149, 157 (1st Cir. 2012)); *see also Holman v. United States*, 505 F.3d 1060, 1067–68 (10th Cir. 2007) (rejecting the government's argument that a "uniform federal rule should . . . govern whether the nominee theory is to apply," and remanding for application of Utah law); *Spotts v. United States*, 429 F.3d 248, 253 (6th Cir. 2005) ("Because there is no indication that the district court applied [state] law before determining the scope of the federal tax lien we must reverse."); *cf. Old W. Annuity & Life Ins. Co. v. Apollo Grp.*, 605 F.3d 856, 861 (11th Cir. 2010) (in a case involving alter ego theory, rejecting under *Drye* the government's argument that federal common law, rather than state law, governs for purposes of determining the taxpayer's interest in the property).

[5] We have not previously provided precedential guidance on this issue, and two of our unpublished dispositions appear to be inconsistent with one another. *Compare Adam v. United States*, 400 F. App'x 175, 176 (9th Cir. 2010) (the district court must look to state law in evaluating nominee status); *with United States v. Wheeler*, 403 F. App'x 301, 302 (9th Cir. 2010) (affirming the application of federal law to determine nominee relationship without reference to state's nominee doctrine).

interest in any property subject to levy for unpaid federal taxes." *Drye*, 528 U.S. at 57. Nevertheless, in reaching that ultimate issue, *Drye* requires that we "look initially to state law" to determine the taxpayer's ownership interest in the property. *Id.* at 58; *see also* Mark A. Segal, *IRS Attacks Asset Transfers Designed to Thwart Tax Collections*, 80 Practical Tax Strategies 78, 79 (2008) (noting that "[s]tate law generally holds significance to the determination of whether a party is a nominee" due to "the long-standing recognition of the role of state law in determining property rights").

The government further urges that the federal common law must govern nominee determinations because the ability to collect taxes is a vital federal interest. The government's position is predicated on a fear that state courts will construe their own nominee doctrines in such a way as to "frustrate specific objectives of the federal" government. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979). To date, however, this concern has proven to be unfounded, because state law nominee doctrine is typically "so similar" to its federal common law counterpart "that the distinction is of little moment." *Shades Ridge Holding Co., Inc. v. United States*, 888 F.2d 725, 728 (11th Cir. 1989). The government's concern that diverging state law nominee doctrines will undermine a "nationally uniform body of law," *Kimbell Foods*, 440 U.S. at 728, is similarly misplaced because courts across many jurisdictions "[a]lmost universally" utilize the same criteria in evaluating nominee relationships. *Dalton*, 682 F.3d at 158.

Moreover, should a state ever adopt an interpretation of the nominee doctrine that frustrates federal objectives, or disrupts commercial relationships, recourse may be sought through the legislative or federal regulatory processes. *See*

Robert T. Danforth, *The Role of Federalism in Administering a National System of Taxation*, 57 Tax Law. 625, 659 (2004) (suggesting that "[i]n cases involving the federal tax lien, federal courts should respect state definitions of property and rights to property" and that "[i]f this approach leads to abuse or raises other tax policy concerns, the remedies should come from Congress, not the courts"); *see also* Teresa Dondlinger Trissell, *A Uniform Standard for Alter Ego and Nominee Tax Litigation*, 58 Fed. Law. 38, 40 (2011) (advocating that Congress or the IRS, through federal regulations, establish a uniform standard for nominee determinations). Because the state law abuses conjured by the government are merely theoretical at this point in time, we decline the government's invitation to ignore state law in evaluating the validity of a tax lien in the nominee context.

Accordingly, we adopt the interpretation of *Drye* advanced by the reasoning of our sister circuits and hold that questions of nominee status require a "fact-specific state-law inquiry" prior to determining whether a nominee lien may lawfully be enforced as a matter of federal law. *Holman*, 505 F.3d at 1068; *see also Spotts*, 429 F.3d at 251 ("[B]efore determining what, if any, federal tax consequences attach, we must first address the pertinent questions of state property law.").

## 1.  California law and nominee doctrine

Appellants assert that California does not recognize a nominee lien theory of ownership. They are mistaken. California cases unambiguously confirm the existence of nominee ownership. *See Lewis v. Hankins*, 262 Cal. Rptr. 532, 536 (Ct. App. 1989) (determining that "the parcels were beneficially owned by defendant because such entities were

mere agents *or nominees* of defendant" (emphasis added)); *see also Parkmerced Co. v. City & Cnty. of S.F.*, 197 Cal. Rptr. 401, 403 (Ct. App. 1983); *Baldassari v. United States*, 144 Cal. Rptr. 741, 744 (Ct. App. 1978); *Baumann v. Harrison*, 115 P.2d 530, 535 (Dist. Ct. App. 1941). Despite California's longstanding recognition of nominee ownership, however, California courts have not yet specified the factors relevant to determining whether a person or entity holds title as a nominee. Given "'the absence of a controlling California Supreme Court decision'" dictating the criteria relevant to a nominee analysis, we "'must predict how the California Supreme Court would decide the issue, using intermediate appellate court decisions, statutes, and decisions from other jurisdictions as interpretive aids.'" *Kairy v. SuperShuttle Int'l*, 660 F.3d 1146, 1150 (9th Cir. 2011) (quoting *Gravquick A/S v. Trible Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003)).

When California courts encounter a dearth of California appellate decisions on a particular legal question, they "often look to decisions of California federal courts and out-of-state cases in resolving" the issue. *August Entm't, Inc. v. Phila. Indem. Ins. Co.*, 52 Cal. Rptr. 3d 908, 916 (Ct. App. 2007). The California Supreme Court specifically gives "'great weight'" to federal court decisions "when they reflect a consensus." *Coral Constr., Inc. v. City & Cnty. of S.F.*, 235 P.3d 947, 958 (Cal. 2010) (quoting *Barrett v. Rosenthal*, 146 P.3d 510, 526 (Cal. 2006)). Applying these principles here, we predict that the California Supreme Court would likely find the federal court cases evaluating nominee ownership to be highly persuasive, for at least two reasons. First, the federal decisions reflect an "almost universal[]" consensus regarding the factors relevant to a nominee analysis. *Dalton*, 682 F.3d at 158. Second, those factors

have been adopted by federal courts in California.[6]  *See, e.g.*, *United States v. Bell*, 27 F. Supp. 2d 1191, 1195 (E.D. Cal. 1998).

The practice of grafting federal nominee doctrine onto an amorphous state law scheme is quite common.  *See* Stephanie Hoffer, *et al.*, *To Pay or Delay: The Nominee's Dilemma under Collection Due Process*, 82 Tul. L. Rev. 781, 809 (2008) (explaining that "[d]ue to the nonstatutory nature of nominee theory, courts have been faced with a dearth of state precedent" and are thus frequently forced to canvass the law of other jurisdictions).  Indeed, federal courts evaluating "ill-defined" nominee doctrines in Alabama, Maine, Montana, Nebraska, New Jersey, and Virginia, have looked to "federal law to supply standards for evaluating" that state's nominee doctrine.  *May v. A Parcel of Land*, 458 F. Supp. 2d 1324, 1337–38 (S.D. Ala. 2006); *see also Dalton*, 682 F.3d at 157; *Cody v. United States*, 348 F. Supp. 2d 682, 694 (E.D. Va. 2004); *Baum Hydraulics Corp. v. United States*, 280 F. Supp. 2d 910, 916 (D. Neb. 2003); *LiButti v. United States*, 968 F. Supp. 71, 75 (N.D.N.Y. 1997); *Towe Antique Ford Found. v. I.R.S., Dep't of Treasury, U.S.*, 791 F. Supp. 1450, 1454 (D. Mont. 1992).

We thus confirm that California law recognizes a nominee theory of property ownership. We also predict that if the

---

[6] Those factors are: "(1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retained possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property." *Spotts*, 429 F.3d at 253 n.2 (internal quotation marks omitted).

California Supreme Court had occasion to evaluate the factors relevant to determining nominee ownership under California law, it would adopt the uniform set of factors generally recognized by federal courts. *See, e.g.*, *Spotts*, 429 F.3d at 253 n.2.

## 2. Application of the nominee theory of ownership

Appellants assert that even if California recognizes nominee ownership, the district court erred in concluding that Appellants hold title to the McCall and Fourth properties as nominees of the Ballantynes.

The district court properly evaluated Appellants' nominee status in light of the six-factor test set forth in *Spotts* and other federal cases. Those factors are:

(1) whether inadequate or no consideration was paid by the nominees;

(2) whether the properties were placed in the nominees' names in anticipation of a lawsuit or other liability while the transferor remains in control of the property;

(3) whether there is a close relationship between the nominees and the transferor;

(4) failure to record the conveyances;

(5) whether the transferor retained possession; and

>     (6) whether the transferor continues to enjoy
>     the benefits of the transferred property.

*Id.* "Virtually without exception, courts focus on the totality of the circumstances," and no single factor is dispositive. *Dalton*, 682 F.3d at 158. Rather, the overarching consideration is "whether the taxpayer exercised active or substantial control over the property." *In re Richards*, 231 B.R. 571, 579 (E.D. Pa. 1999).

The federal tax liens properly attached to the McCall and Fourth properties only if one or both of the Ballantynes individually held title to the properties (or held title to the properties through a revocable inter-vivos trust in which Susanne was the sole trustee and beneficiary), or if Appellants are found to have been nominees of the Ballantynes as of the dates of the various tax assessments. *See* 26 U.S.C. §§ 6321, 6322. The assessments at issue in this case were made on January 2, 1995, June 30, 1997, and November 16, 1998. The first assessment occurred before Susanne caused the Ballantyne Trust to transfer the McCall and Fourth properties to Appellants. If Appellants are adjudged to be independent third-party purchasers who paid "adequate and full consideration" for the properties, then the federal tax lien related to the initial assessment would not attach to the properties. *See* 26 U.S.C. § 6323(a), (h)(6). The tax lien related to the January 1995 assessment will attach, however, if Appellants are found to have been nominees of the Ballantynes at the time of the initial transfer.

We agree with the district court that an evaluation of the totality of the circumstances in this case strongly indicates that Appellants were nominees of the Ballantynes as of June 1995, the date of the initial transfer of the properties, and on

the dates of the subsequent assessments. Nearly every factor supports the existence of a nominee relationship.

The first factor, which considers whether inadequate or no consideration was paid by the nominee, strongly favors the government. Although the Fourth and McCall properties were initially transferred for adequate consideration, consisting of partnership interests in Leeds and Fourth Investment, those interests were subsequently transferred to Hemet C in exchange for promissory notes that were improperly reduced in value, and the assumption of various unsecured "debts" owed to family members or family-owned entities (many of which were already in default). The district court properly found that these reduced notes and unsecured debts of dubious value rendered consideration inadequate. Appellants nevertheless assert that any inadequacy of consideration relating to the Hemet C transfer cannot affect their ownership interests with regard to the first transfer, which was supported by adequate consideration. Appellants fail to recognize, however, that we evaluate the nominee issue in light of the totality of the circumstances, and that in this case, among other factors, Don acknowledged that the transfers were all part of a larger scheme to convey the properties to the Children's Trusts.

The second factor, whether the properties were transferred to the nominees in anticipation of a lawsuit while the transferor remained in control of the property, similarly supports the existence of a nominee relationship. The record demonstrates that the Ballantynes transferred the properties only weeks after their tax court trial. Moreover, Don acknowledged that the transfers were effectuated to protect against "future liabilities." After the transfers, the Ballantynes maintained possession of the McCall residence,

directed the income stream of the Fourth property, and controlled both properties through their ownership and control of Leeds and Fourth Investment. *See Berkshire Bank*, 708 F.3d at 253. Indeed, the Ballantynes continued to exert the same type of control over the properties that an owner would. For example, they funded the property expenses of the McCall residence instead of paying the monthly rent required in the lease, and they failed to notify the tenants of the Fourth property regarding a change in the ownership of the property. Although Susanne resigned from her positions at Rhodes (the 1% general partner of Leeds and Fourth Investment) prior to the third assessment, it is undisputed that she continued to perform services for the limited partnerships exactly as she had before her resignation, by, for example, signing checks for Leeds and Fourth Investment through 1999, and acting as bookkeeper through at least 2004. Though Appellants contend that Susanne performed these managerial functions after her resignation as an employee of Ocean Business Services LLC, we agree with the district court that Ocean Business (yet another Ballantyne-owned entity) was simply another vehicle utilized by the Ballantynes to obscure their continued control of Leeds and Fourth Investment.

The third factor, which evaluates the closeness in relationship between the nominees and the transferor, also persuasively indicates the existence of a nominee relationship. The government established that Appellants (along with every other entity involved in the Ballantynes' complex scheme) were wholly owned and controlled by one or more of the Ballantynes or their children at the time of the initial transfer and subsequent assessments.

The fourth factor alone partially favors Appellants, because the conveyances of title between the Ballantynes and Appellants were ultimately recorded. However, this factor is not particularly persuasive because none of the conveyances was recorded promptly. Indeed, the district court suspected that the Ballantynes had backdated several of the documents produced at trial because so many of them had not been recorded until months or even years after their alleged execution. The fact that the recording of the property conveyances was similarly delayed (by more than three months in the case of the Fourth property, and by more than two years in the case of the McCall property) further strengthens this inference of backdating. Thus, we agree with the district court that, on balance, the fourth factor is only marginally helpful to the Ballantynes.

Finally, the fifth and sixth factors, which consider whether the transferor continued to retain possession and enjoy the benefits of the transferred property, strongly favor the government. After the transfers, the Ballantynes continued to maintain possession of the McCall property and enjoy it as their primary residence exactly as they had before the transfer. They benefitted from a leasehold relationship in which they could ignore key terms of the lease, such as rent payment, without consequence. The Ballantynes also continued to enjoy the benefits of the Fourth property after the transfer by continuing to control the distribution of rental income. As the district court found, the Ballantynes additionally retained the benefit of transferring the Fourth property to their children in a way they believed would avoid the realization of any taxable gain.

Because these factors inescapably affirm the existence of a nominee relationship when viewed in light of the totality of

the circumstances, the district court properly determined that Appellants held the McCall and Fourth properties as nominees of the Ballantynes.

## 3.  Required Joinder

For the first time on appeal, Appellants assert that the district court's judgment should be vacated because the more than thirteen shell entities involved in the Ballantynes' complex tax avoidance scheme were not joined in the action. Appellants' claim is unavailing.

Federal Rule of Civil Procedure 19(a) provides in relevant part that a person "must be joined as a party if that person claims an interest relating to the subject of the action and . . . disposing of the action in the person's absence may as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1). Appellants fail to identify the specific entities they contend must be joined or explain how the interests of those entities will be impaired by the judgment in this case absent joinder. Moreover, none of these entities ever attempted to join this litigation—and Appellants never moved to join them—despite the fact that the entities were both owned and controlled by the Ballantynes, who were considerably involved in the district court trial.

In any event, the district court made no findings of fact regarding the validity of any third party's interest in the properties; instead, it adjudicated only whether Leeds and Fourth Investment held title in the McCall and Fourth properties as nominees of the Ballantynes when the relevant tax liens attached to those properties.  Appellants cite no authority requiring third party joinder in a situation such

as this one, where the district court has neither quieted title nor determined whether the federal tax liens are effective against third parties. "[W]hen the judgment appealed from does not in a practical sense prejudicially affect the interests of the absent parties, and those who are parties have failed to object to non-joinder in the trial court, [we] will not dismiss an otherwise valid judgment." *Sierra Club v. Hathaway*, 579 F.2d 1162, 1166 (9th Cir. 1978) (citations omitted). Accordingly, Appellants have not established that the absent entities were necessary parties under Rule 19(a), and the district court properly resolved Appellants' ownership interests in the McCall and Fourth properties in their absence. *See Eldredge v. Carpenters 46 N. Cal. Cntys. Joint Apprenticeship & Training Comm.*, 662 F.2d 534, 537 (9th Cir. 1981).

## CONCLUSION

For the foregoing reasons, the district court's judgment is affirmed.

**AFFIRMED.**