Filed 12/15/22  A.H. v. Labana CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| A.H. et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>ALICIA LABANA,<br><br>        Defendant and Respondent. | A165836, A165841<br><br>(Santa Clara County Super. Ct. No. 20CV369829) |

Plaintiffs A.H. and H.H. are former students at Saint Francis High School.  Defendant Alicia Labana is the parent of a student there.  Following certain racist incidents involving students and former students, Labana helped organize a protest march.  She publicized it by sharing another parent's Facebook post which included a photograph depicting plaintiffs wearing a dark substance on their faces and the statement "kids [were] participating in black face."  Plaintiffs ultimately withdrew from Saint Francis in lieu of being expelled.

Plaintiffs then sued the high school, its president, and Labana.  As to Labana, they alleged a single cause of action for defamation, specifically libel

1

per se.[1]  Labana filed a special motion to strike (anti-SLAPP motion[2]), which the trial court granted.  The court entered a separate order awarding her attorney fees and costs.

Plaintiffs appeal both the judgment of dismissal following the grant of the anti-SLAPP motion and the fee order.[3]

As to the grant of Labana's anti-SLAPP motion, only the second prong of the trial court's analysis—that plaintiffs failed to establish a probability of prevailing on the merits of their defamation claim—is at issue.  Plaintiffs maintain the trial court erred in ruling Section 230 of the Communications Decency Act (47 U.S.C. § 230 (Section 230)) provides immunity to Labana because it erred in concluding the basis of their defamation claim was the photograph, rather than the "participating in black face" statement.  We affirm.

## BACKGROUND

Plaintiffs alleged that following the killing of George Floyd by police in 2020, a "racist meme"[4] began circulating via social media among Saint

---

[1]  They alleged causes of action against Saint Francis for breach of contract, declaratory relief, breach of right to fair procedure, violation of "Leonard's Law" (Ed. Code, § 48950), and slander per se.  They also alleged slander per se against the president.  Neither the high school nor the president are parties to this appeal.

[2]  "An anti-SLAPP motion seeks to strike a '[s]trategic lawsuit against public participation,' that is, a 'SLAPP.' "  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 882, fn. 2.)

[3]  We ordered that the appeals be considered together for the purposes of briefing, oral argument, and disposition.

[4]  A "meme" is defined by the Oxford English Online Dictionary as an "image, video, piece of text, etc., typically humorous in nature, that is copied and spread rapidly by internet users, often with slight variations."  (Oxford English Dictionary Online (2022)

Francis community members. The same night the racist meme began circulating, another Saint Francis student obtained a photograph from a Spotify account showing plaintiffs and another individual wearing a dark substance on their faces. That student allegedly uploaded the photograph to a group chat, identified plaintiffs and the third individual by name, and "insinuate[ed] that they were using 'blackface' as 'another example' of racist SFHS students." The student urged others to "disseminate the Photograph to others in the [Saint Francis] community, which subsequently took place."

The following day, the Dean of Students called the plaintiffs' parents about the photograph. The parents told the dean the boys were wearing green acne masks, and that the photo was taken three years earlier. The day after that, the principal called the plaintiffs' parents and informed them their sons were "not welcome[]" at Saint Francis and he would allow them to voluntarily withdraw from the school.

Labana, the mother of another student, learned about the racist memes and commented on another individual's Facebook post "ready for shame the kids and their parents." She helped to organize a protest march with another individual, H.J. Labana initially prepared a flyer about the protest march, which did not include the photograph or any statements about "blackface," titled "Marching For Racial Equality at St. Francis H.S." In her declaration, she stated "My flyer was admittedly not very good and, as a result, it was not used."

Labana then reposted an "event post" on Facebook that was created and initially posted by H.J., and which included the photograph at issue. This copy of the photograph was taken from another individual's social media

_____

<https://www.oed.com/view/Entry/239909?redirectedFrom=meme#eid> [as of Dec. 15, 2022].)

3

account.  None of the individuals in the photograph were identified by name. The event post stated:  "This is a protest to [*sic*] the outrageous behavior that current and former students from SFHS did–A George Floyd [I]nstagram account making fun of his death, the fact that he could not breath [*sic*] and kids participating in black face and thinking that this is all a joke.  [¶] Does the SFHS administration think this is a joke?  Please join us at the entrance of the school off of Miramonte St. and make sure this administration knows that this type of behavior will NOT be tolerated.  [¶] Please remember to practice social distancing, wear a mask and bring a sign if you would like!  Feel free to add people to this list."  The event post indicated the hosts were Labana and H.J.

Wendy C., the mother of one of the plaintiffs, submitted a declaration in opposition to the motion.  She declared she "learned about a Facebook post entitled 'Concerned Parents-Black Lives Matter,' which broadcast a march that was scheduled to begin at [SFHS] the next day. . . .  The Facebook Post stated that it was a public event, hosted by [H.J.] and [Labana].  At the top of the Facebook Post was the Photograph of my son. . . ."  Wendy C. sent an e-mail to Labana, demanding she "immediately remove any and all posts of [plaintiffs].  You are engaging in criminal activity for intentionally targeting a minor(s) without substantiating the facts of the matter, and you are guilty of breaking California defamation and libel laws and are subject to lawsuit." (Capitalization omitted.)  Wendy C. sent Labana a similar message on LinkedIn, and telephoned her.  According to Labana, Wendy C. "yelled at [her] belligerently," but "did not explain what, if anything, was inaccurate about the Facebook post," nor did she say anything about " 'acne masks.' " Labana e-mailed her back, stating "Please do not call me again, if you do I will call the police on you for threatening me.  I am not scared of you or your

4

family and I will stand up for what's right. Your son's images are all over the internet and we copied your son[']s and those of others from other images that are now all over social media."

Labana forwarded Wendy C.'s e-mail to the SFHS Dean of Faculty, copying Wendy C., and writing "We are [now] getting legal threats from Wendy, mother of [H.H.]. At the very least instead of this mom addressing the issues and apologizing for her son's behavior, she's now threatening us with [legal] action. Bring it on! We have enough money to take this all the way."

Over a week later, the Los Altos Town Crier published an online article which stated Labana had called for plaintiffs to be expelled. Plaintiffs alleged Labana, in the article, "discussed the 'students in black face' as 'racist,' and stated '[t]here's got to be some serious consequences, and I'm talking expulsion. I don't want my daughter going to school with a bunch of racists.' "

## DISCUSSION

### *Legal Background*

" ' "The Legislature enacted [Code of Civil Procedure] section 425.16 to prevent and deter 'lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' ([Code Civ. Proc.,] § 425.16, subd. (a).) Because these meritless lawsuits seek to deplete 'the defendant's energy' and drain 'his or her resources' [citation], the Legislature sought ' "to prevent SLAPPs by ending them early and without great cost to the SLAPP target" ' [citation]. [Code of Civil Procedure] [s]ection 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." ' "

(*Central Valley Hospitalists v. Dignity Health* (2018) 19 Cal.App.5th 203, 216 (*Central Valley*).)

" '[S]ubdivision (a) of section 425.16 [of the Code of Civil Procedure] expressly mandates, the section "shall be construed broadly." ' " (*Central Valley, supra,* 19 Cal.App.5th at p. 216.) " '[Code of Civil Procedure] [s]ubdivision (b)(1) of section 425.16 provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." [Code of Civil Procedure] [s]ubdivision (e) of section 425.16 elaborates the four types of acts within the ambit of a SLAPP. . . .' " (*Central Valley*, at p. 216.)

Code of Civil Procedure section 425.16, subdivision (e) provides "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Thus, a two-step process is used in determining whether an action is a SLAPP. "Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least 'minimal merit.'" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).)

"Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89, italics omitted.)

***Probability of Prevailing on Defamation Cause of Action***

Plaintiffs do not take issue with the trial court's prong-one ruling—that their defamation claim arose from protected speech. Rather, they maintain the trial court erred as to the second prong in concluding they had no probability of prevailing on their defamation claim given Section 230.

Section 230 provides in pertinent part: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." (§ 230(c)(1).) "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." (§ 230(e)(3).) The statute defines "[i]nformation content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." (§ 230(f)(3).) "[S]ection 230 provides immunity only if the interactive computer service does not 'creat[e] or develop[]' the information 'in whole or in part.' See 47 U.S.C. § 230(f)(3)." (*Fair Housing*

7

*Council of San Fernando Valley v. Roommates.com, LLC* (9th Cir. 2008) 521 F.3d 1157, 1166.) " 'We believe that both the immunity for passive conduits and the exception for co-developers must be given their proper scope and, to that end, we interpret the term "development" as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness. In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct.' " (*Phan v. Pham* (2010) 182 Cal.App.4th 323, 326, fn. 5, italics omitted (*Phan*), quoting *Roommates.com*, at pp. 1167–1168.)

"[B]y its terms section 230 exempts Internet intermediaries from defamation liability for republication. The statutory immunity serves to protect online freedom of expression and to encourage self-regulation, as Congress intended. Section 230 has been interpreted literally. It does not permit Internet service providers or users to be sued as 'distributors,' nor does it expose 'active users' to liability." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 63 (*Barrett*).) "By declaring that no 'user' may be treated as a 'publisher' of third[-]party content, Congress has comprehensively immunized republication by individual Internet users." (*Id.* at p. 62.)

"Section 230(e)(3) underscores, rather than undermines, the broad scope of section 230 immunity by prohibiting not only the imposition of 'liability' under certain state[-]law theories, but also the pursuit of a proscribed 'cause of action.' (See *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.* (4th Cir. 2009) 591 F.3d 250, 254 [§ 230 is not just a ' "defense to liability" '; it instead confers ' "immunity from suit" ' (italics omitted)]; [citation].) This inclusive language, read in connection with section 230(c)(1) and the rest of section 230, conveys an intent to shield Internet

8

intermediaries from the burdens associated with defending against state[-]law claims that treat them as the publisher or speaker of third[-]party content, and from compelled compliance with demands for relief that, when viewed in the context of a plaintiff's allegations, similarly assign them the legal role and responsibilities of a publisher *qua* publisher. [Citations.] As evidenced by section 230's findings, Congress believed that this targeted protection for republishers of online content would facilitate the ongoing development of the Internet. (See § 230(a)(1), (4), (b)(1), (2).)" (*Hassell v. Bird* (2018) 5 Cal.5th 522, 544–545.)

Plaintiffs do not dispute that Section 230 immunizes individuals "who merely repost 'information that originated from another source,' " citing *Barrett, supra,* 40 Cal.4th at page 39. And they concede "the Photograph itself was [not] defamatory."[5]

Instead, plaintiffs maintain "the trial court made a factual error in finding that [they] had sued Labana for publication of a *Photograph* attached to her Facebook Post, rather than for her [own] defamatory *statements* accusing [plaintiffs] of 'blackface' in her Facebook Post." They assert the court's "fundamental misunderstanding of the defamatory conduct at issue was the sole basis for its finding that [Section] 230 immunity applied to Labana."

The trial court's order granting Labana's anti-SLAPP motion recognized that plaintiffs' cause of action against Labana alleged in part: " 'Labana published the Facebook Post, which clearly depicted and identified A.H. and H.H. and falsely accused them of engaging in "blackface." This false

---

[5] Plaintiffs assert "[t]here is nothing defamatory about the Photograph as it depicts innocent activity of three young teenage boys trying to treat childhood acne with green acne facemasks."

accusation was made in conjunction with holding a march and rally to demand, in part, that SFHS take disciplinary action against A.H. and H.H.' " The court went on to conclude plaintiffs were unable to demonstrate a probability of prevailing on their defamation claim because it was barred by Section 230.

Quoting *Barrett*, the trial court explained Section 230 has been " 'widely and consistently interpreted to confer broad immunity against defamation liability for those who use the Internet to publish information that originated from another source.' . . . 'Plaintiffs are free under section 230 to pursue the originator of a defamatory Internet publication.' " (See *Barrett*, *supra*, 40 Cal.4th at p. 39.) The court further stated the complaint "admits on its face . . . that [p]laintiffs know the identity of the individuals who originally made the photograph available to other individuals on the internet, including . . . Labana. The fact that those individuals are (or were at the time) minors in no way creates an exception to section 230 . . . or otherwise permits a defamation claim against . . . Labana based on the Facebook Post. As Defendant Labana used the Internet (Facebook) to publish information (the photograph of [p]laintiffs) that originated from another source, she is entitled to 'broad immunity against defamation liability' under section 230. . . ."

While it is true that the trial court spoke in terms of the republished photograph, it is not clear the court based its conclusion as to Section 230 immunity solely on that basis. For example, the court stated plaintiffs' cause of action against Labana alleged in part: " 'Labana published the Facebook Post, which clearly depicted and identified A.H. and H.H. and falsely accused them of engaging in "blackface." This false accusation was made in

conjunction with holding a march and rally to demand, in part, that SFHS take disciplinary action against A.H. and H.H.' "

In any case, we review an anti-SLAPP motion de novo and may affirm on any ground shown by the record. We therefore "consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' ([Code Civ. Proc.,] § 425.16, subd. (b)(2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3; see *Park, supra*, 2 Cal.5th at p. 1067; *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 675 ["We review the record independently to determine whether the asserted cause of action arises from activity protected under the statute and, if so, whether the plaintiff has shown a probability of prevailing on the merits."].)

The unrebutted evidence submitted in support of the anti-SLAPP motion demonstrates that Labana was neither the original poster, creator, nor developer of the "blackface" photograph *or* of the Facebook event post with the "blackface" statement. (See § 230(f)(3).) The photo was originally posted online in connection with a Spotify music playlist by a friend of one of the boys in the photograph. H.J., the co-organizer of the protest march, created and posted the Facebook event post. Labana declared, "[H.J.] created the Facebook Post and selected its contents, . . . including the photograph of Plaintiffs and a friend with their faces painted dark. I understand that [H.J.] found that photograph on another person's social media page and then incorporated it into the Facebook Post that she created. . . . I shared the Facebook Post with Facebook groups . . . and a WhatsApp group for SFHS

11

parents and alumni. . . . I shared the Facebook Post by posting a link to it on the [Facebook] message boards and also to the WhatsApp group." "I did not create the Facebook Post or select its contents, including the photograph[s] of [Students] and a friend with their faces painted dark." Labana, herself, originated only a flyer for the protest march which did not contain the photograph at issue or any reference to "blackface," and which was not used in the Facebook event post. Indeed, she stated in a comment on a Facebook post on which she attempted to post the flier she had created "folks I am trying to make this event public and having difficulty (technically challenged. . . .)."

Despite this uncontradicted evidence, plaintiffs assert Section 230 does not immunize Labana's re-post because she "admitted in writing that she had helped create the Facebook Post. . . ." They claim the evidence shows the following: "(1) the Facebook Post lists Labana as a 'host'; (2) on [a Saint Francis alumnus's] Facebook page, Labana admitted she 'created' the march, and repeatedly encouraged others to attend it; and (3) Labana admitted in writing that she helped create the Facebook Post . . . stating . . . 'we copied your son[']s [photographs] and those of others from other images. . . .' " At oral argument, plaintiffs' counsel also asserted Labana's e-mail to the SFHS Dean of Faculty and her online comment that she wanted to "shame" plaintiffs permit an inference that she was lying in her declaration about not "creating" or "developing" the Facebook post, thus raising an issue of material fact.

As *Phan* observed, " 'the term "development" . . . refer[s] not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness.' " (*Phan, supra,* 182 Cal.App.4th at p. 326, fn. 5.)

None of the evidence plaintiffs identify conflicts with the evidence demonstrating Labana was not the original poster of either the photograph or the Facebook event post, or the evidence that she was not the creator or developer of that post. There is no dispute Labana opined the students and former students who participated in racist acts should be shamed. Nor is there a dispute Labana was one of the "hosts" and "creators" of the protest march and she encouraged others to attend. But that does not mean she was the originator, creator, or developer of the Facebook event post. As for her e-mail to one of the plaintiff's mothers, it said "Your son's images are all over the internet and we copied your son[']s [images] . . . from other images that are now all over social media" This does not remotely suggest Labana was the original poster, creator or developer of the material. Indeed, it establishes the opposite.

At oral argument, plaintiffs' counsel maintained Labana's e-mail to the Dean of Faculty created an inference that Labana lied in her declaration because she did not say she was being wrongfully accused of defamation. Though Labana did not use legal terminology, her e-mail did dispute that she had defamed plaintiffs by noting "instead of this mom addressing the issues and apologizing for her son's behavior, she's now threatening us with legal action." And the fact she said nothing in the e-mail to the Dean of Faculty about who created the Facebook post does not create an inference she was lying in her declaration. Nor does Labana's comment on an e-mail thread that plaintiffs and their parents should be shamed, create an inference she lied in her declaration about not creating the Facebook post. There is no question Labana was upset and believed plaintiffs should face consequences for engaging in what she perceived as racist acts. But none of the evidence

13

submitted by plaintiffs creates even an inference that she lied about not being the creator of the Facebook post.

Plaintiffs' counsel further asserted Labana was required to make the same showing a litigant must make to defeat a summary judgment motion and that plaintiffs precluded Labana from doing so by questioning her credibility (i.e., counsel argued a jury could "disbelieve" Labana's statements in her declaration). However, " '[t]o avoid summary judgment, [a plaintiff] "must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses.' " (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807.) "We emphasize that an issue of fact can only be created by a conflict of evidence. It is not created by speculation or conjecture." (*Ibid.*) Indeed, Code of Civil Procedure section 437c provides in part: "If a party is otherwise entitled to summary judgment pursuant to this section, summary judgment shall not be denied on grounds of credibility or for want of cross-examination of witnesses furnishing affidavits or declarations in support of the summary judgment, except that summary judgment may be denied in the discretion of the court if the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to that fact; or if a material fact is an individual's state of mind, or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof." (Code Civ. Proc., § 437c, subd. (e).) A "trial court may not deny summary judgment on grounds of credibility of witnesses furnishing declarations in support of the summary judgment. . . . A triable issue of fact can only be created by a conflict of evidence, not speculation or conjecture." (*Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1453.) To defeat the anti-SLAPP motion, plaintiffs were required to demonstrate a "*probability* of prevailing on

14

the merits." (*Stewart v. Rolling Stone LLC, supra,* 181 Cal.App.4th at p. 675, italics added.) While that is a relatively low bar, it is not cleared simply by claiming a jury might "disbelieve" a declarant's statements in the absence of any *evidence* suggesting the statements are false.

In sum, the uncontroverted evidence demonstrated Labana was not the original poster, creator or developer of either the photograph or "blackface" statement included in the Facebook event post. Accordingly, the trial court did not err in concluding Section 230 immunized Labana from liability for defamation based on that post.

### *The Town Crier Statement*

#### *No Defamation Claim Alleged*

Plaintiffs claim they alleged a "second defamation claim," this one based on "Labana's defamatory Town Crier statement," that the trial court assertedly and "improperly dismissed on a technicality"—the "technicality" being their failure to plead a defamation claim based on the "Town Crier" statement. The trial court ruled, "having chosen to base the sixth cause of action on [the Facebook event post], [plaintiffs'] argument in opposition that Labana's motion fails to address her alleged statement to the Los Altos Town Crier . . . is not a basis for denial of the motion."

Plaintiffs assert that by incorporating by reference in their sixth cause of action for *libel* the "Factual Background" allegations of their complaint, they also alleged a cause of action for *slander* based on the statement attributed to Labana in the Town Crier article. They are mistaken.

Paragraph 48 of the "Factual Background" section of the complaint alleged "On June 18, 2020, the Los Altos Town Crier published an online article in which Ms. Labana again publicly called for SFHS to expel Plaintiffs. Ms. Labana discussed the 'students in black face' as 'racist' and

15

stated '[t]here's got to be some serious consequences, and I'm talking about expulsion.  I don't want my daughter going to school with a bunch of racists.' "  The sixth cause of action, as did every other cause of action, "incorporate[d] every allegation contained in each and every one of the above paragraphs. . . ." [6]

However, the substantive allegations of the sixth cause of action referred only to the Facebook event post and asserted only a claim of libel per se.  Thus, the allegations of the sixth cause of action provided no notice that plaintiffs were additionally making a slander claim based on the statement the Town Crier attributed to Labana.  (See *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 240 ["The primary function of a pleading is to give the other party notice so that it may prepare its case."].)

Moreover, "[o]n review of an anti-SLAPP motion to strike . . . the standard is akin to that for summary judgment or judgment on the pleadings. We must take the complaint as it is."  (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, 476.)

Thus, the trial court did not err in ruling plaintiffs alleged only one defamation claim—for libel per se based on the Facebook event post.

### *No Right to Amend Complaint*

Plaintiffs alternatively assert they should be allowed to amend their complaint.  They acknowledge "it is not appropriate to allow" amendments to

---

[6] "Complaints generally incorporate prior allegations into subsequent causes of action.  (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2001) ¶ 6:236, p. 6–52 ['common practice to incorporate by reference various allegations . . . to save repetition'].)" (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 931–932.)

allege a new cause of action to defeat an anti-SLAPP motion, but claim "they seek only to repeat an allegation that has been set forth in their original complaint since its filing. . . ." Counsel also acknowledged at oral argument that plaintiffs did not raise the issue of amendment until the hearing on the anti-SLAPP motion, after the court had issued a tentative ruling granting Labana's anti-SLAPP motion.

As plaintiffs recognize, a " 'plaintiff cannot avoid [an anti-]SLAPP motion by amending the complaint.' " (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1263.) " '[Code of Civil Procedure] section 425.16 provides no mechanism for granting anti-SLAPP motions with leave to amend.' [Citation.] Courts have routinely concluded that plaintiffs may not be permitted to evade the intent of the anti-SLAPP statute by amendment once faced with an anti-SLAPP motion." (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 897 (*Medical Marijuana*).) "One of the reasons that a plaintiff is not permitted to amend in the face of an anti-SLAPP motion, and particularly after obtaining a ruling on an anti-SLAPP motion, is to prevent a lawsuit from becoming a moving target and thereby undermining the very purpose of the statute." (*Ibid.*)

Relying on *Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858 (*Nguyen-Lam*), plaintiffs assert it is "appropriate" to allow amendment "when the plaintiff seeks to properly plead a necessary element of an already articulated cause of action, and when the plaintiff has shown a probability of prevailing on the merits. . . ." "Assuming that *Nguyen-Lam* was correctly decided," it "appears to present the sole exception to [the] otherwise broadly accepted rule" prohibiting amendment in these circumstances. (*Medical Marijuana, supra,* 46 Cal.App.5th at pp. 898–899.)

17

In *Nguyen-Lam,* the school board voted to hire plaintiff as the school superintendent. (*Nguyen-Lam*, *supra*, 171 Cal.App.4th at p. 863.) After the district issued a press release about her hiring and she gave notice at her prior employment, one of the school board members called another board member, telling her she had been investigating plaintiff. (*Id*. at pp. 863– 864.) She then put the defendant on the line, "maliciously accused Dr. Nguyen-Lam of being a Communist, inexperienced, and unqualified for the position." (*Id*. at p. 864.) Less than a week later, the board voted to terminate her as superintendent. (*Ibid*.) Nguyen-Lam sued for defamation. (*Ibid*.)

In his anti-SLAPP motion, the defendant asserted plaintiff failed to allege actual malice. (*Nguyen-Lam*, *supra*, 171 Cal.App.4th at p. 867.) Plaintiff conceded that as the new superintendent she was, "albeit briefly . . . a public figure." (*Ibid*.) However, she pointed out that in her complaint, she had alleged that the defendant "called her a Communist 'for malicious purposes' 'to get her fired.' " (*Id*. at p. 868.) She further alleged he "made his statements 'with intent, malice, fraud, or oppression. . . .' " (*Ibid*.) In a declaration submitted in connection with the anti-SLAPP motion, the defendant admitted "he had never met plaintiff and knew of her only through media reports. Nothing in those reports hinted she was a Communist." (*Id*. at p. 869.) The trial court allowed the plaintiff to amend her complaint, couching "its ruling as an order granting defendant's motion to strike, but with leave for plaintiff to amend her complaint to cure any deficiency concerning actual malice." (*Ibid*.)

The Court of Appeal affirmed, observing "one court has held similar language—that the defendant acted ' "maliciously and oppressively, and in conscious disregard of [plaintiff's] rights" '—insufficient 'to state a cause of

18

action in a case where actual malice . . . is required.' " (*Nguyen-Lam*, *supra*, 171 Cal.App.4th at p. 868.)  The court concluded, however, that it "need not resolve whether plaintiff adequately alleged actual malice in her original complaint because facts probative of actual malice emerged through the evidence the parties submitted for the hearing on the strike motion."  (*Id.* at p. 868.)  Thus, allowing amendment was not error "where, as here, the evidence prompting amendment is found in the declarations already submitted for the hearing, [thus] there is no risk the purpose of the strike procedure will be thwarted with delay, distraction, or increased costs."  (*Id.* at p. 872.)

Although plaintiffs characterize their proposed amendment as simply curing a "technical error" by "repeat[ing] an allegation that has been set forth in their original complaint since filing," that is hardly the case.  What they are, in fact, seeking to do is add new substantive allegations to support a new cause of action, namely slander, because the cause of action they alleged, libel per se, is barred by Section 230.  This goes far beyond what *Nguyen-Lam* sanctioned.

At oral argument, plaintiffs' counsel maintained the only difference between the alleged libelous statement in the Facebook post and the alleged slanderous statements to the Town Crier was "the audience."  To the contrary, the Facebook post included the photograph, thereby identifying the plaintiffs.  While the Town Crier article quoted Labana, she did not identify the plaintiffs in any way, other than stating the asserted perpetrators were students at SFHS.  Specifically, the news article stated, "Beyond the Instagram post mocking [George] Floyd, Labana said she has also seen other racist posts by members of the St. Francis community, including one of students in black face.  When Labana saw them, she e[-]mailed the

administrators wanting to know how the school will be responding." The Town Crier article also did not include the "blackface" photo. Thus, it was not merely the "audience" that differed with respect to the Facebook post and the Town Crier article, it was the substance of the publications.

As in *Medical Marijuana*, "it would not be appropriate to permit plaintiffs to amend their complaint to plead [an] entirely new cause[] of action, particularly when there was nothing prohibiting the plaintiffs from pleading claims based on the purportedly defamatory unpled statements at the outset of this action." (*Medical Marijuana, supra*, 46 Cal.App.5th at p. 900.)

### *Order Granting Attorney Fees and Costs*

Plaintiffs appealed from the fee and cost order to ensure that if they obtained a reversal of the anti-SLAPP order and dismissal, the fee and cost order would also be reversed. They do not take issue with the amount of fees and costs awarded. Since we are affirming the anti-SLAPP order and dismissal, we likewise affirm the fee and cost order.[7]

### DISPOSITION

The judgment of dismissal and the order awarding trial court fees and costs to respondent are AFFIRMED. Costs on appeal to respondent.

---

[7] We therefore do not reach plaintiffs' claim that Labana's anti-SLAPP motion was made in bad faith and was frivolous, and therefore they should be awarded attorney fees under Code of Civil Procedure section 425.16, subdivision (c)(1), which provides in part: "If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5."

_____
Banke, J.


We concur:


_____
Humes, P.J.


_____
Devine, J.*


*Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A165836, A165841, AH et al v. Labana